[908 NYS2d 639]

ROBERT NALDI, Respondent, v MICHAEL GRUNBERG, Defendant,
and GRUNBERG 55 LLC, Appellant.

First Department, October 5, 2010

2

APPEARANCES OF COUNSEL

*Tarter Krinsky & Drogin, LLP*, New York City (*Linda S. Roth, Andrew N. Krinsky* and *Rachel S. Fleishman* of counsel), for appellant.

*Goldberg Weprin Finkel Goldstein LLP*, New York City (*Matthew Hearle* and *Kevin J. Nash* of counsel), for respondent.

## OPINION OF THE COURT

FRIEDMAN, J.

The complaint in this action seeks enforcement of a right of first refusal that plaintiff claims he held for 30 days while conducting due diligence in contemplation of entering into a contract to purchase real property. Defendant Grunberg 55 LLC, appealing from the denial of its motion to dismiss, argues, among other things, that the alleged right of first refusal is not enforceable under the applicable statute of frauds (General Obligations Law § 5-703) because it was memorialized in an e-mail only.[1] We reject this argument, reaffirming our prior decisions that have held (albeit without extensive discussion) that an e-mail will satisfy the statute of frauds so long as its contents and subscription meet all requirements of the governing statute. In this case, however, the record—including plaintiff's admissions in the complaint, the undisputed documentary evidence of the parties' dealings, and the affidavit of plaintiff's representative in the negotiations—establishes as a matter of law that plaintiff never accepted the right of first refusal proposed in the e-mail. The right to match "any legitimate, better offer" proffered by the e-mail was tied to the asking price of $52 million. Given that the parties did not tentatively agree on the price term linked to the right of first refusal proposed in the e-mail, there was never any meeting of the minds between the parties as to that right of first refusal. Although plaintiff apparently alleges that the parties subsequently reached an oral or implied-in-fact agreement that plaintiff would have a right of first refusal based on a different price term ($50 million), any such unwritten right of first refusal is unenforceable under General Obligations Law § 5-703. Accordingly, defendant's motion to dismiss the complaint should have been granted.

The complaint alleges that, on February 9, 2007, plaintiff, a citizen and resident of Italy, offered, through his broker, to

---

1. The dismissal of the complaint as against the individual defendant (the principal of Grunberg 55 LLC) is not at issue on this appeal. Accordingly, we hereinafter use the term "defendant" to refer to Grunberg 55 LLC only.

purchase the property owned by defendant at 15-19 West 55th Street in Manhattan for $50 million. Three days later, on February 12, defendant's broker, Mark Spinelli of Massey Knakal Realty Services, responded to plaintiff's broker with an e-mail that stated in pertinent part:

> "Below is a response to your customer's offer for 15-19 West 55th Street. Please review with your customer and let me know how you would like to proceed.
>
> "Counteroffer: $52 million
>
> "DD: No due diligence period although complete unfettered access and first right of refusal on any legitimate, better offer during a 30 day period[.]
>
> "Deposit: 10% deposit hard in escrow in the US upon signing of contract that the ownership will furnish to them forthwith. Negotiations will take place during their due diligence.
>
> "The ownership will not take the property off the market for anyone without a signed contract and hard money.
>
> "Mark J. Spinelli
>
> "Director of Sales
>
> "Massey Knakal Realty Services."

The complaint does not allege, and conspicuously omits from its partial quotation of the above e-mail, the price term ($52 million) contained in defendant's counteroffer. Instead, the complaint alleges that Spinelli's February 12 e-mail "duly acknowledged Plaintiff's offer and made a counterproposal, while providing Plaintiff with the subject Right of First Refusal in consideration for his continuing interest in the property." The complaint further alleges: "Based upon the actual, constructive and/or apparent authority of Massey Knakal, the Right of First Refusal was immediately binding and enforceable and provided Plaintiff with specific and definite rights in the Property."

After receiving the above e-mail, plaintiff allegedly began conducting costly due diligence on the property. The record shows that the parties exchanged e-mail concerning this due diligence, which required defendant's cooperation. For example, an e-mail from plaintiff's counsel to defendant's counsel, dated

February 26, 2007, states: "[W]e [plaintiff's counsel] would like to send 2 people on Wednesday to review Seller's records/files in regard to the property. Please advise where the files are located and whether Seller is able to accommodate the Wednesday request."

Despite the $52 million counteroffer set forth in Spinelli's e-mail, on or about February 16, 2007, defendant's attorney forwarded to plaintiff's attorney a draft of a contract for sale of the property for $50 million, the amount of plaintiff's original offer. Notably, far from alleging that the $50 million price term in the draft contract was a mistake, the complaint affirmatively relies on the draft contract as evidence of an alleged tentative agreement in principal that the property would be sold for $50 million. In this regard, the complaint alleges: "Significantly, the contract forwarded by [defendant's attorney] provided for a $50 million purchase price consistent with Plaintiff's offer without any indication that the contract was not to be considered a definitive offer to sell the Property for $50 million." To like effect, plaintiff's representative in this matter, Federico Santini, stated in his affidavit opposing the motion to dismiss:

> "Defendants fail to explain why the proposed contract contains a purchase price of $50 million (not $52 million). The dissemination of a $50 million contract, prepared by Defendants' own counsel, not only suggests that the purported $52 million counterproposal was not seriously pursued by Defendants, but also completely undermines Defendants' argument that Plaintiff rejected the counteroffer of $52 million. In view of the subsequent [draft] contract, Massey Knakal's email [sic] must be read to simply mean that a counteroffer was potentially under discussion by the parties' [sic] subject, of course, to Plaintiff's right of first refusal."

Neither the draft contract nor the cover letter transmitting it (which are in the record) contains any reference to a right of first refusal.

The complaint further alleges that plaintiff subsequently learned that defendant was pursuing a sale with a third party in the amount of $52 million. In March, plaintiff sent defendant a letter purporting to exercise the "first right of refusal" referenced in Spinelli's February 12 e-mail, stating:

> "Pursuant to the first right you granted me as per

above [*sic*; nothing appears above], I hereby offer to purchase the properties for a cash consideration of $52,000,000 . . . . I am ready to sign the sale contract and to deposit 10% in escrow on [*sic*] your attorney's account within [*sic*] 9:00 P.M. of Monday 12th March, 2007."

Defendant rejected the foregoing offer and went forward with the sale of the property to another purchaser.

The complaint asserts a single cause of action against defendant for breach of contract, based on defendant's refusal to honor the right of first refusal allegedly granted to plaintiff in the February 12 e-mail of defendant's broker. In lieu of answering, defendant moved to dismiss the complaint pursuant to CPLR 3211 (a) (5) and (7), arguing: (1) that there was never any meeting of the minds as to the right of first refusal; (2) that the right of first refusal was barred by the statute of frauds because it was memorialized only in an e-mail; (3) that, even if it is possible for an e-mail to satisfy the applicable statute of frauds, the e-mail in question contained only the automatically generated identification block of the brokerage firm from which it was sent and therefore was not properly subscribed; and (4) that neither Spinelli, the broker for defendant whose e-mail referred to the right of first refusal, nor his firm (Massey Knakal) had authority under the firm's listing agreement to contractually bind defendant. As previously stated, we reverse on the ground that there was no meeting of the minds on the right of first refusal embodied in Spinelli's e-mail counterproposal to sell the property for $52 million, and any oral or implied-in-fact agreement on a right of first refusal with reference to a different price term is barred by the statute of frauds.

■ At the outset of our analysis, we reject defendant's argument that an e-mail can never constitute a writing that satisfies the statute of frauds of General Obligations Law § 5-703 ("Conveyances and contracts concerning real property required to be in writing").[2] Again, this Court has held in other contexts that e-mails may satisfy the statute of frauds (*see Williamson v*

---

**2.** Each of the first three subdivisions of General Obligations Law § 5-703 sets forth a writing requirement applicable in specified circumstances. Defendant relies on General Obligations Law § 5-703 (3), which provides:

"A contract to devise real property or establish a trust of real property, or any interest therein or right with reference thereto, is void unless the contract or some note or memorandum thereof is in writing and subscribed by the party to be charged therewith, or by his lawfully authorized agent."

*Delsener*, 59 AD3d 291 [2009] [stipulation settling litigation]; *Stevens v Publicis S.A.*, 50 AD3d 253, 255-256 [2008], *lv dismissed* 10 NY3d 930 [2008] [modification of written agreement barring oral changes], citing *Rosenfeld v Zerneck*, 4 Misc 3d 193 [Sup Ct, Kings County 2004] [stating, in dicta, that an e-mail reflecting an agreement to sell real property may satisfy the statute of frauds, although the e-mail at issue failed to state all essential terms]; *see also Bazak Intl. Corp. v Tarrant Apparel Group*, 378 F Supp 2d 377, 383-386 [SD NY 2005] [holding that e-mail satisfied the requirement of a "writing in confirmation of the contract" under New York's UCC 2-201 (2)]).[3] We reaffirm the holdings of *Williamson* and *Stevens*.

Somewhat paradoxically, in support of its argument that an e-mail is not a writing for these purposes, defendant relies on a 1994 amendment of the general statute of frauds (General Obligations Law § 5-701 [b], enacted by L 1994, ch 467, § 1, as amended by L 2002, ch 286) specifically providing that, as to certain "qualified financial contracts" defined in the legislation (*see* General Obligations Law § 5-701 [b] [2]), the record of an "electronic communication" (General Obligations Law § 5-701 [b] [3] [a]), such as a retrieved e-mail, satisfies the statute of frauds (*see* General Obligations Law § 5-701 [b] [1]; *see also* General Obligations Law § 5-701 [b] [4] ["For purposes of this subdivision, the tangible written text produced by . . . computer retrieval or other process by which electronic signals are transmitted by telephone or otherwise shall constitute a writing"]). In essence, defendant argues that, since the Legislature specifically amended only General Obligations Law § 5-701

---

However, there is authority treating General Obligations Law § 5-703 (2) as the provision applicable to a contract creating a right of first refusal as to real property (*see Pfeil v Cappiello*, 29 AD3d 1187, 1188 [2006]). General Obligations Law § 5-703 (2) provides:

> "A contract for the leasing for a longer period than one year, or for the sale, of any real property, or an interest therein, is void unless the contract or some note or memorandum thereof, expressing the consideration, is in writing, subscribed by the party to be charged, or by his lawful agent thereunto authorized by writing."

Under either subdivision, our analysis of whether the writing requirement may be satisfied by an e-mail would be the same.

**3.** *Cf. MP Innovations, Inc. v Atlantic Horizon Intl., Inc.*, 72 AD3d 571, 572 (2010) (e-mail did not satisfy the statute of frauds because it failed to "identify a number of material terms" of the alleged agreement); *Page v Muze, Inc.*, 270 AD2d 401, 401 (2000) (e-mail did not satisfy the statute of frauds where it "made only an equivocal reference" to the right claimed by plaintiff and "was not shown to have satisfied the subscription requirement").

(which does not apply to "contracts concerning real property" covered by General Obligations Law § 5-703) to specify that an e-mail or other electronic communication constitutes a writing—and even then only as to a specifically defined subset of the transactions covered by General Obligations Law § 5-701— the implication is that an electronic communication cannot satisfy the statute of frauds for contracts outside the scope of the amendment. This argument might have had some plausibility as a matter of statutory construction when General Obligations Law § 5-701 (b) was first enacted.[4] Sixteen years later, however, with e-mail omnipresent in both business and personal affairs, it is too late in the day to accept it.[5]

In 1994, when General Obligations Law § 5-701 (b) was enacted, electronic communication was still relatively novel.[6] The legislative history of the original amendment indicates that the background of the bill was that, by 1994, institutions entering into certain complex financial agreements (such as foreign exchange contracts, financial and commodity swaps, and other derivatives) had come to rely on e-mail and other electronic means of communication, rather than paper writings, to memorialize those transactions. As noted in one of the relevant legislative memoranda, "[i]n the marketplace, these agreements are considered binding from the moment agreement is reached"

---

**4.** *See* McKinney's Cons Laws of NY, Book 1, Statutes § 74 ("the failure of the Legislature to include a matter within the scope of an act may be construed as an indication that its exclusion was intended"); § 197, Comment, at 368 ("that two independent statutes contain similar provisions does not require that an amendment of one be incorporated as an amendment to the other," since "[t]he Legislature can amend one or both, in its discretion"); § 240, Comment, at 411 ("the specific mention of one person or thing implies the exclusion of other persons or thing[s]"); *but see* § 76, Comment, at 169 ("rules of construction for a statute are to be invoked only where its language leaves its purpose and intent uncertain"); § 91, Comment, at 174 ("The object of these [rules of statutory construction] is not to lay down inflexible principles . . . but to render assistance in determining the legislative intent," and "[r]esort is had to the rules . . . only when it is necessary to apply them to ascertain the meaning of a statute").

**5.** We thus disagree with *Vista Developers Corp. v VFP Realty LLC* (17 Misc 3d 914 [Sup Ct, Queens County 2007]), which essentially accepted the argument made by defendant here (*see id.* at 919-921).

**6.** That electronic communications were still relatively novel in 1994 is illustrated by the fact that a New York federal court, in a decision issued that year, deemed it advisable to explain what the Internet was and how it worked (*see MTV Networks, a Div. of Viacom Intl., Inc. v Curry*, 867 F Supp 202, 203 nn 1, 2 [SD NY 1994]). The court noted that, at the time, "[a]n estimated 25 million individuals have some form of Internet access, and this audience is doubling each year" (*id.* at 203 n 1).

(Mem of Assembly Rules Comm in Support of L 1994, ch 467, 1994 NY Legis Ann, at 317). At that time, however, there was a perceived uncertainty whether such agreements were immediately enforceable under the statute of frauds if the parties entered into them through electronic means of communication (*see id.* ["under current law there is a 'gap' in that the agreement is not legally binding on a party unless and until the other party receives 'a note or memorandum subscribed by the party to be charged therewith,' if to be performed over a period in excess of one year"]).[7] To remove this uncertainty, the Legislature amended General Obligations Law § 5-701 to make clear that a "qualified financial contract [as defined] . . . is legally binding from the moment agreement is reached" (Senate Introducer Mem in Support, Bill Jacket, L 1994, ch 467, at 10).

Today, a decade into the twenty-first century, e-mail is no longer a novelty. Although not enacted by New York, the Uniform Electronic Transactions Act (7A ULA [part 1] 211 [1999] [UETA]), which was promulgated in 1999 and has been enacted by 47 states, the District of Columbia, and the Virgin Islands (*see* 7A ULA [part 1], 2010 Pocket Part, at 146), provides, inter alia, that "[a] contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation" (UETA § 7 [b]) and that "[i]f a law requires a record to be in writing, an electronic record satisfies the law" (UETA § 7 [c]).[8] Moreover, in 2000, Congress enacted the Electronic Signatures in Global and National Commerce Act (15 USC

---

**7.** The scholarly literature of the early 1990s recognized that whether the record of an electronic communication could satisfy the statute of frauds was an open question as of that time (*see* DiPaolo, Note and Comment, *The Application of the Uniform Commercial Code Section 2-201 Statute of Frauds to Electronic Commerce*, 13 JL & Com 143 [1993]; Wilkerson, Comment, *Electronic Commerce under the U.C.C. Section 2-201 Statute of Frauds: Are Electronic Messages Enforceable?*, 41 U Kan L Rev 403 [1992]; Electronic Messaging Services Task Force, *The Commercial Use of Electronic Data Interchange—A Report and Model Trading Partner Agreement*, 45 Bus Law 1645, 1682-1689 [1990]). The uncertainty persisted as late as 1998 (*see* Robertson, *Electronic Commerce on the Internet and the Statute of Frauds*, 49 SC L Rev 787, 807-809 [1998]). According to the last cited article, as of the time of its writing, "no court has yet determined whether a computer-stored or computer-generated record satisfies the Statute of Frauds" (*id.* at 804; *but see Mirchel v RMJ Sec. Corp.*, 205 AD2d 388, 390 [1994] [holding in the alternative that "documentary evidence in defendant's own files, including . . . computer records," satisfied the writing requirement of General Obligations Law § 5-1105]).

**8.** *See also* UETA § 7, Official Comment 1 (the "fundamental premise" of the UETA is "that the medium in which a record, signature, or contract is created, presented or retained does not affect [its] legal significance").

§ 7001 *et seq.*, as added by Pub L 106-229, 114 US Stat 464 [E-SIGN]), which provides in pertinent part:

> "Notwithstanding any statute, regulation, or other rule of law . . . , with respect to any transaction in or affecting interstate or foreign commerce—
>
> "(1) a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form; and
>
> "(2) a contract relating to such transaction may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation" (15 USC § 7001 [a]).

It could be argued (although plaintiff has not done so) that E-SIGN applies here based on plaintiff's Italian nationality, and perhaps on other grounds as well (*see* 12 Lawrence's Anderson on the Uniform Commercial Code, E-SIGN § 101:2 [3d ed]). However, we need not determine whether the transaction at issue here was one "in or affecting interstate or foreign commerce" for purposes of E-SIGN. Any uncertainty that existed in 1994 as to whether the record of an electronic communication satisfied the statute of frauds under New York state law has long since been resolved.

In 1999, the New York Legislature enacted the Electronic Signatures and Records Act (ESRA), now article III (formerly article I) of the State Technology Law (L 1999, ch 4, § 2, as amended by L 2002, ch 314, and by L 2004, ch 437). ESRA does not specifically address whether an "electronic record" constitutes a writing for purposes of the statute of frauds.[9] However, ESRA does provide, in pertinent part:

> "In accordance with this section [directing the state Office for Technology to establish rules and regulations governing the use of electronic signatures and authentication] unless specifically provided otherwise by law, an electronic signature may be used by

---

**9.** ESRA defines "electronic record" to mean "information, evidencing any act, transaction, occurrence, event, or other activity, produced or stored by electronic means and capable of being accurately reproduced in forms perceptible by human sensory capabilities" (ESRA § 302 [2]). E-SIGN defines the same term as "a contract or other record created, generated, sent, communicated, received, or stored by electronic means" (15 USC § 7006 [4]).

a person in lieu of a signature affixed by hand. The use of an electronic signature shall have the same validity and effect as the use of a signature affixed by hand" (ESRA § 304 [2]).[10]

In 2002, the Legislature enacted certain amendments to ESRA. Among other things, the 2002 legislation amended ESRA's definition of the term "electronic signature" to conform to E-SIGN's definition of the same term (see L 2002, ch 314, § 2).[11] Section 1 of chapter 314 of the Laws of 2002 sets forth the Legislature's intent in amending ESRA as follows:

"Legislative intent. [ESRA] is intended to support and encourage electronic commerce and electronic government by allowing people to use electronic signatures and electronic records in lieu of handwritten signatures and paper documents. Subsequent to the adoption of ESRA, [E-SIGN] was adopted [by Congress] to permit and encourage the expansion of electronic commerce in interstate and foreign commercial transactions. Like ESRA, this federal law authorizes the use and acceptance of electronic signatures and electronic records in the context of these commercial transactions. It is the intent of this bill to ensure that these laws continue to complement each other in achieving their stated purposes. Rather than seeking to modify, limit or supercede federal law [as E-SIGN permits states to do to a defined extent], the legislature finds that it is in the best interest

---

**10.** While the applicable statute of frauds requires a signature or other subscription by the party to be charged or its duly authorized agent (see General Obligations Law § 5-703 [2], [3])—a matter apparently addressed by ESRA § 304 (2)—ESRA, as codified, does not directly address whether an electronic record constitutes a writing for purposes of the statute of frauds. ESRA § 305 (3) provides that "[a]n electronic record shall have the same force and effect as those records not produced by electronic means," but, viewed in the context of the remainder of section 305, this provision appears to be addressed to government records. The regulation promulgated by the Office for Technology providing that "[a]n electronic record used by a person shall have the same force and effect as those records not produced by electronic means" (9 NYCRR 540.5 [a]) also appears, in the context of the remainder of section 540.5, to be addressed to documents filed with the government.

**11.** ESRA § 302 (3) now defines "electronic signature" to mean "an electronic sound, symbol, or process, attached to or. logically associated with an electronic record and executed or adopted by a person with the intent to sign the record." This substantially conforms to the definition of "electronic signature" set forth in E-SIGN (15 USC § 7006 [5]).

of the state of New York, its citizens, businesses and government entities for State and federal law to work in tandem to promote the use of electronic technology in the everyday lives and transactions of such individuals and entities. It is with this finding in mind that the following amendments are made to the state technology law'' (2002 McKinney's Session Laws of NY, at 1034).

By adopting the foregoing statement of legislative intent, New York's lawmakers appear to have chosen to incorporate the substantive terms of E-SIGN into New York state law.[12] Thus, we conclude that E-SIGN's requirement that an electronically memorialized and subscribed contract be given the same legal effect as a contract memorialized and subscribed on paper (15 USC § 7001 [a]; *see* 12 Lawrence's Anderson on the Uniform Commercial Code, E-SIGN §§ 101:4, 101:6; Nimmer, Law of Computer Technology §§ 13:13, 13:15) is part of New York law, whether or not the transaction at issue is a matter "in or affecting interstate or foreign commerce."[13]

Even in the absence of E-SIGN and the 2002 statement of legislative intent, given the vast growth in the last decade and a half in the number of people and entities regularly using e-mail, we would conclude that the terms "writing" and "subscribed" in General Obligations Law § 5-703 should now be construed to include, respectively, records of electronic communications and electronic signatures, notwithstanding the limited scope of the

---

**12.** An alternative approach, which the Legislature evidently chose not to take, would have been to adopt UETA, as most states have done. E-SIGN permits states to supersede the federal act by enacting UETA (*see* 15 USC § 7002 [a]).

**13.** In this regard, the legislative memorandum in support of the 2002 amendments to ESRA demonstrates that the bill was motivated by a desire to eliminate possible inconsistencies between ESRA and E-SIGN. The memorandum states:

"It is essential . . . to the success and promotion of electronic commerce and electronic government for both laws to be interpreted and applied consistently. Determining which law applies to particular transactions has caused confusion in the business community and thereby has an inhibiting effect on the expansion of electronic commerce in New York. Consequently, [the Office for Technology] is proposing that ESRA be amended to eliminate some of the definitional differences between ESRA and [E-SIGN]" (Senate Mem in Support of L 2002, ch 314, 2002 McKinney's Session Laws of NY, at 1881).

1994 amendment of the general statute of frauds.[14] As one scholar has observed, "In most cases, . . . definitions of a 'writing' or a 'signature' are transferable to the electronic context and the primary issue is whether the writing contains the relevant, required content" (Nimmer, Law of Computer Technology § 13:12). As much as a communication originally written or typed on paper, an e-mail retrievable from computer storage serves the purpose of the statute of frauds by providing " 'some objective guaranty, other than word of mouth, that there really has been some deal' " (*Bazak Intl. Corp. v Mast Indus.*, 73 NY2d 113, 120 [1989], quoting 1954 Report of NY Law Rev Commn, at 119; *see also Bazak Intl. Corp. v Tarrant Apparel Group*, 378 F Supp 2d at 383-384 ["because '(u)nder any computer storage method, the computer system "remembers" the message even after being turned off,' whether or not the e-mail is eventually printed on paper or saved on the server, it remains an objectively observable and tangible record that such a confirmation exists"], quoting Wilkerson, 41 U Kan L Rev at 412). The writing and subscription requirements of the statute of frauds have been held flexible enough to accommodate earlier innovations in communications technology, such as the telegram, the telex, and the fax (*see* Robertson, 49 SC L Rev at 797-803; Wilkerson, 41 U Kan L Rev at 409-414), and the same logic used to reach those results "justif[ies] a rule that permits e-mail or other electronic media to constitute an acceptable memorandum, so long as the other requirements of a valid memorandum are met" (10 Lord, Williston on Contracts § 29:23, at 592 [4th ed]; *see also Shattuck v Klotzbach*, 14 Mass L Rptr 360, 2001 WL 1839720, *4, 2001 Mass Super LEXIS 642, *9-10 [2001] [decided before state's adoption of UETA]; Maker, *Of Keystrokes and Ballpoints: Real Estate and the Statute of Frauds in the Electronic Age*, 80 NY St BJ [No. 6] 46, 47 [July/Aug. 2008] [the "similarity between telegrams and e-mails cogently argues for the importation of 'telegram jurisprudence' into the world of e-mails"]).

Notwithstanding that an e-mail may satisfy the statute of frauds, we conclude that the motion should have been granted

---

**14.** This approach seems to be consistent with the current weight of authority nationwide (*see* John E. Theuman, Annotation, *Satisfaction of Statute of Frauds by E-Mail*, 110 ALR5th 277, 283, § 2 ["Courts addressing this question have. . . determined on a case-by-case basis whether the particular e-mail messages . . . satisfy the elements of the applicable Statute of Frauds provision, an approach which may imply acceptance of the general proposition that e-mails can satisfy the Statute of Frauds in a proper case"]).

and the complaint dismissed. Even if the e-mail on which plaintiff relies would satisfy General Obligations Law § 5-703, the allegations of the complaint itself, together with plaintiff's admissions and undisputed documentary evidence in the record, establish, as a matter of law, that there was never a meeting of the minds between the parties on the terms of the proposed right of first refusal set forth in the February 12, 2007 e-mail sent by Spinelli, defendant's broker. Again, the e-mail, in response to plaintiff's prior offer to purchase the property for $50 million, made a "[c]ounteroffer" to sell the property for $52 million and, during the period of plaintiff's anticipated precontractual due diligence, to subject the property to a "first right of refusal on any legitimate, *better* offer during a 30 day period" (emphasis added). Thus, the offer of a right of first refusal was inextricably linked to the proposed purchase price of $52 million; without at least an agreement in principle on price, the words "better offer" would be meaningless. As discussed below, plaintiff's own allegations, as well as the undisputed documentary evidence, make plain that there was never any tentative agreement on the $52 million figure set forth in the e-mail.

The draft contract sent by defendant's counsel to plaintiff's counsel on or about February 16, 2007 contained a price term of $50 million. Standing alone, this might raise a question of whether a mistake was made in the preparation of the draft contract, and, if so, whether the conduct of plaintiff's agents in contacting defendant to conduct due diligence constituted an acceptance of the right of first refusal set forth in Spinelli's e-mail. Plaintiff himself, however, has eliminated any such question by making clear, through admissions in his complaint and in his agent's affidavit opposing the motion to dismiss, that he never agreed to the $52 million figure. The complaint alleges that, "[s]ignificantly," the $50 million draft contract was "consistent with Plaintiff's offer without any indication that the contract was not to be considered a definitive offer to sell the Property for $50 million." Similarly, plaintiff's representative in the negotiations, Federico Santini, states in his affidavit that "[t]he dissemination of the $50 million contract, prepared by Defendants' own counsel," meant that Spinelli's e-mail "must be read to simply mean that a counteroffer was potentially under discussion"—in other words, that there was no meeting of the minds on the $52 million figure, which plaintiff, by his own account, rejected (*see Gram v Mutual Life Ins. Co. of N.Y.*, 300 NY 375,

382 [1950] ["It is a fundamental rule of contract law that an acceptance must comply with the terms of the offer"]; *Homayouni v Banque Paribas*, 241 AD2d 375, 376 [1997] ["whenever a purported acceptance is even slightly at variance with the terms of an offer, the qualified response operates as a rejection and termination of—and substitution for—the initially offered terms"]).[15]

Thus, plaintiff himself avers that his suit is not based on any agreement that he would enjoy the right of first refusal set forth in Spinelli's e-mail—which, to reiterate, was linked to the $52 million counteroffer contained in the same e-mail—but on an alleged agreement that he would enjoy a right of first refusal linked to a contemplated purchase price of $50 million. It may be that the parties did reach such an agreement but, if they did, that agreement was oral or implied-in-fact, as it is not documented by the writings in the record, whether those writings are viewed individually or in aggregate. In this regard, it bears emphasis that a right to match any offer "better" than $52 million—as set forth in the e-mail on which plaintiff relies—is entirely different from a right to match any offer at all or any offer better than $50 million—the latter being the undocumented right plaintiff apparently claims he was granted.[16] It follows that the latter alleged right of first refusal cannot be pieced together from the Spinelli e-mail (offering a right of first refusal linked to a $52 million price term) and the subsequently forwarded draft contract (containing a $50 million price term but silent as to any right of first refusal). Since the essential

---

**15.** If the foregoing left any room for doubt as to the terms of the alleged agreement on which plaintiff is suing, nowhere in his appellate brief does plaintiff even mention that the same e-mail he invokes to satisfy the statute of frauds offered to sell him the property for $52 million, not $50 million. Indeed, plaintiff's brief frankly takes the position that the parties agreed on a price of $50 million:

"In Mr. Spinelli's email [*sic*], [defendant] duly acknowledged [plaintiff's] offer to purchase the Property for $50 million and provided [plaintiff] with a 'first right of refusal on any legitimate, better offer during a 30 day period.' Thereafter, [defendant] forwarded a Contract to [plaintiff] unambiguously incorporating the terms of the Email [*sic*] between Mr. Spinelli and [plaintiff's broker] and the agreement between [defendant] and [plaintiff] for the purchase and sale of the Property for $50 million" (brief for plaintiff-respondent at 7 [record citations omitted]).

**16.** Indeed, the alleged third-party offer of $52 million would not have triggered the right to match an offer "better" than $52 million set forth in Spinelli's e-mail.

terms of the right of first refusal plaintiff seeks to enforce are not set forth in any writing or group of writings, the applicable statute of frauds (General Obligations Law § 5-703) bars this action.[17]

Finally, as previously noted, defendant makes two additional arguments. The first of these is that the "signature block" at the bottom of the Spinelli e-mail (identifying the writer and his title, firm, address, and telephone and fax numbers) was automatically generated by the e-mail system rather than deliberately typed and therefore does not qualify as an intentional subscription for purposes of the statute of frauds (*see Parma Tile Mosaic & Marble Co. v Estate of Short*, 87 NY2d 524 [1996]). Defendant's remaining argument is that, even if Spinelli "subscribed" the e-mail within the meaning of General Obligations Law § 5-703, neither he nor his brokerage firm, Massey Knakal, had authority to enter into binding contracts on defendant's behalf. Given that the complaint must be dismissed for the reason already discussed, we need not resolve whether either of these additional arguments would furnish independent grounds for dismissing the complaint on a pre-answer, pre-discovery motion.

Accordingly, the order of the Supreme Court, New York County (Herman Cahn, J.), entered December 15, 2008, which, to the extent appealed from, denied the motion of defendant-appellant Grunberg 55 LLC to dismiss the complaint as against it, should be reversed, on the law, with costs, and the motion granted. The Clerk is directed to enter judgment accordingly.

Tom, J.P., Andrias, Nardelli and Catterson, JJ., concur.

Order, Supreme Court, New York County, entered December 15, 2008, reversed, on the law, with costs, and the motion of defendant-appellant Grunberg 55 LLC to dismiss the complaint as against it granted. The Clerk is directed to enter judgment accordingly.

---

**17.** Plaintiff does not argue that he may avoid the bar of the statute of frauds to the extent his due diligence efforts constitute "part performance" under General Obligations Law § 5-703 (4). In any event, plaintiff's due diligence efforts would not qualify as "part performance" for these purposes because such conduct was not unequivocally referable to the alleged right of first refusal sought to be enforced (*see Chan v Shew Foo Chin*, 62 AD3d 471 [2009]).